IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

SOUTHERN DIVISION

No. X:24-CV-XX

| | |
|---|---|
| ENVIRONMENTAL JUSTICE COMMUNITY ACTION NETWORK,<br><br>             Plaintiff,<br><br>v.<br><br>GFL ENVIRONMENTAL, INC.; SAMPSON COUNTY DISPOSAL, LLC; WASTE INDUSTRIES, USA, LLC; WASTE INDUSTRIES, LLC; BLACK CREEK RENEWABLE ENERGY, LLC,<br><br>             Defendants. | **COMPLAINT**<br>Fed. R. Civ. P. 7 |

## COMPLAINT

The Environmental Justice Community Action Network ("EJCAN"), by and through its counsel, files these Resource Conservation and Recovery Act and Clean Water Act claims against GFL Environmental, Inc., Sampson County Disposal, LLC; Waste Industries, USA, LLC; Waste Industries, LLC; and Black Creek Renewable Energy, LLC (together, "GFL" or "Defendants"), and alleges as follows:

## STATEMENT OF THE CASE

1.  This is a citizen suit brought by EJCAN pursuant to Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), and Section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365(a)(1).

1

2.       RCRA authorizes private parties to sue any person who has caused or contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment. GFL's past and present handling, storage, treatment, transportation, and disposal of solid waste at the Sampson County Landfill ("the Landfill"), has caused toxic per- and polyfluoroalkyl substances ("PFAS") to pollute groundwater, surface water, soil, air, and residential drinking water wells near the Landfill. This ongoing pollution may imminently and substantially endanger residents of Snow Hill, a rural, working-class community located in Roseboro, North Carolina.

3.       The CWA prohibits the discharge of pollutants into surface waters by any person, including corporate entities, except in compliance with the express terms of a National Pollutant Discharge Elimination System ("NPDES") permit. The CWA authorizes private parties to bring suits alleging violations of the Act, including discharges not authorized by a NPDES permit and discharges in violation of a NPDES permit. GFL has unlawfully discharged toxic PFAS compounds into Bearskin Swamp, a popular fishing stream in the Snow Hill community, since at least 2019. GFL's unlawful discharges continue to this day.

4.       Bearskin Swamp, a tributary of the Little Coharie River and part of the Cape Fear River Basin, flows along the Eastern border of the Landfill. Bearskin Swamp is a popular fishing area and recreation space for the Snow Hill community. GFL's ongoing, unlawful discharges of toxic PFAS into Bearskin Swamp harm this stream

2

and wetland ecosystem and the many people who swim, boat, fish, and recreate in and around Bearskin Swamp.

5. This action seeks declaratory and injunctive relief, civil penalties, and costs of litigation, including expert fees and expenses and reasonable attorney fees.

## JURISDICTION, VENUE, AND NOTICE

6. This Court has subject matter jurisdiction over the RCRA claim in this action under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B) (citizen suits alleging imminent and substantial endangerment), and 28 U.S.C. § 1331 (federal question jurisdiction).

7. This Court has subject matter jurisdiction over the CWA claims in this action under Section 505 of the CWA, 33 U.S.C. § 1365 (citizen suits), and 28 U.S.C. § 1331 (federal question jurisdiction).

8. This Court has personal jurisdiction over the parties in this case because this suit relates to activities or occurrences taking place in the state of North Carolina, specifically, GFL's operation of a regional landfill in North Carolina and its resulting pollution of Bearskin Swamp and the Snow Hill community in Roseboro, North Carolina.

9. GFL purposefully availed itself of the benefits of conducting waste management activities in North Carolina by operating this solid waste facility in the state. Plaintiff's claims arise from pollution caused by waste management practices at the Sampson County Landfill. *See Fields v. Sickle Cell Disease Ass'n of Am., Inc.*, 376 F. Supp. 3d 647, 651 (E.D.N.C. 2018).

3

10. Venue is proper in the Eastern District of North Carolina because Sampson County, the Sampson County Landfill, the Town of Roseboro, the community of Snow Hill, and Bearskin Swamp are all located in this District. The violations and endangerment alleged in this complaint have occurred, and continue to occur, in the Eastern District of North Carolina. 42 U.S.C. § 6972(a); 33 U.S.C. § 1365(c)(1); 28 U.S.C. § 1391(b)(2).

11. A copy of this Complaint has been served on the Attorney General of the United States, the Regional Administrator of the Environmental Protection Agency ("EPA") for Region 4, and the EPA Administrator on the same date that this complaint is being filed with the Court. 42 U.S.C. § 6972(b)(2)(F); 40 C.F.R. § 135.4 (2024).

12. EJCAN has complied with the pre-suit notice provisions of RCRA. Pursuant to Section 7002 of RCRA, 42 U.S.C. § 6972(b), on February 13, 2024, EJCAN mailed notices of intent to file suit under RCRA to GFL, the Administrator of the EPA, the Regional Administrator of the EPA, the North Carolina Department of Environmental Quality ("DEQ"), and the United States Attorney General. [Hereinafter "RCRA Notice," attached hereto as Exhibit 1 (Notice of Intent, and receipt of notice to Defendants, EPA, DEQ, and Attorney General), incorporated by reference herein]. The notice period began on the date after which all parties had been served, which was March 1, 2024.

13. Plaintiffs are filing this Complaint after the statutorily required notice period of ninety (90) days has ended. 42 U.S.C. § 6972(b)(2)(A). The date of filing, August 30, 2024, is 182 days after the RCRA notice period began on March 1, 2024.

14.     EPA has not commenced, nor is it prosecuting, a civil action in a court of the United States under 42 U.S.C. § 6973 or under 42 U.S.C. § 9606 to address the imminent and substantial endangerment to health or the environment alleged in the RCRA Notice. EPA has not engaged in a removal action nor incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604. EPA has not obtained a court order (including a consent decree) or issued an administrative order under 42 U.S.C. § 9606 or 42 U.S.C. § 6973, pursuant to which GFL is conducting a removal action, Remedial Investigation and Feasibility Study, or proceeding with a remedial action on the property. 42 U.S.C. § 6972(b)(2)(B).

15.     DEQ has not commenced, nor is it prosecuting, an action under 42 U.S.C. § 6972(a)(1)(B) to address the imminent and substantial endangerment to health or the environment alleged in the RCRA Notice. DEQ has not engaged in a removal action under 42 U.S.C. § 9604. DEQ has not incurred costs to initiate a Remedial Investigation and Feasibility Study under 42 U.S.C. § 9604 on the property. 42 U.S.C. § 6972(b)(2)(C).

16.     EJCAN has complied with the pre-suit notice provisions of the CWA. Pursuant to Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), on May 7, 2024, EJCAN sent notices of intent to file suit under the CWA via certified mail to GFL, the EPA Administrator, the Regional Administrator of the EPA, DEQ, and the United States Attorney General. [Hereinafter "CWA Notice," attached hereto as Exhibit 2 (Notice of Intent, and receipt of notice to Defendants, EPA, DEQ, and Attorney General), incorporated by reference herein]. This Notice complied with 33 U.S.C. § 1365(b)(1)(A), and with 40 C.F.R. Part 135, Subpart A.

17. Plaintiff is filing this Complaint after the statutorily required notice period of sixty (60) days has ended. 33 U.S.C. § 1365(b)(1)(A). The date of filing, August 30, 2024, is 115 days after the CWA notice period began on May 7, 2024.

18. Neither EPA nor DEQ has commenced, nor are they diligently prosecuting, a civil or criminal action in a court of the United States, or a State to redress the violations of the CWA alleged in the CWA Notice. 33 U.S.C. § 1319(g)(6). Additionally, neither EPA nor DEQ has commenced an administrative civil penalty action under Section 309(g) of the CWA, 33 U.S.C. § 1319(g), or a comparable North Carolina law, to redress violations of the CWA by GFL set forth in the CWA Notice. *Id.*

## PARTIES

**Plaintiff EJCAN and Its Members**

19. EJCAN is a "citizen" within the meaning of the CWA, 33 U.S.C. § 1365(a) and 1365(g).

20. EJCAN is a "person" within the meaning of RCRA, 42 U.S.C. §§ 6903(15) and 6972(a).

21. EJCAN is a North Carolina non-profit membership organization that works to ensure that all Sampson County residents have access to clean and safe air, water, and soil. EJCAN has approximately 200 members who attend monthly EJCAN meetings, other EJCAN events, and/or receive regular updates about EJCAN's work via text messages or email.

22. EJCAN's principal place of business is located at 209 W. Morisey Blvd., Clinton, NC 28328.

23.     EJCAN has members who rely on water from residential drinking water wells
        contaminated by GFL's PFAS pollution. These members own, reside in, and/or spend
        substantial amounts of time in homes located near the Landfill that rely on residential
        wells as the source of their household water supply and drinking water. Some EJCAN
        members have had their residential drinking water wells tested and the results have
        shown unsafe concentrations of PFAS in the water. These members thus have
        property, economic, and health interests in the groundwater supplying these wells and
        have been, and will continue to be, directly and substantially injured by GFL's
        ongoing pollution of residential drinking water wells with PFAS, which may
        endanger these members' health and safety.

24.     EJCAN also has members who garden, fish, or hunt on their property, or in public
        rights-of-way, near the Landfill, including in and around Bearskin Swamp, or used to
        engage in these activities but no longer do so because of their concerns about GFL's
        pollution.

25.     EJCAN also has members who own real property, reside, work, socialize, or attend
        church in the Snow Hill community.

26.     The CWA and RCRA violations alleged herein have directly and substantially harmed
        EJCAN members and lessened these members' property and economic interests, as
        well as their recreational and aesthetic enjoyment of Bearskin Swamp, the Little
        Coharie River, and their tributaries. These members would use and enjoy their
        properties and these waters more if the violations alleged herein ceased.

27.     These injuries will not be redressed except by an order from this Court requiring GFL
        to cease its ongoing PFAS discharges to Bearskin Swamp; abate ongoing PFAS

pollution of groundwater, surface water, air, and soil; remediate existing PFAS contamination of surface water, groundwater, air, and soil; and provide safe, alternative drinking water supplies to EJCAN members whose residential drinking water wells have been contaminated by GFL's PFAS pollution.

28. Enforcement by this Court as to EJCAN's claims asserted and relief sought in this Complaint, including injunctive relief to cease and remedy the violations, and the imposition of civil penalties, would provide redress for the injuries suffered by EJCAN and EJCAN's members. Because these injuries are caused by GFL's handling, storage, treatment, transportation, or disposal of solid waste containing PFAS, they fall within the zone of interests protected by RCRA's imminent and substantial endangerment provision. Likewise, because these injuries are caused by unlawful discharges of pollution into waters of the United States, they fall within the zone of interests protected by the CWA.

**Defendants**

29. Defendant GFL Environmental, Inc. ("GFL Environmental") is a Canadian waste management corporation.

30. GFL Environmental is headquartered in Toronto, Canada, and has its principal place of business in Vaughan, Canada.

31. GFL Environmental conducts substantial business across North America and the Southeastern United States, including North Carolina, where it has purposefully availed itself of the benefits of conducting waste management activities on a for-profit basis throughout the state.

8

32. Defendant Sampson County Disposal, LLC ("SCD") is a wholly-owned and operated subsidiary of GFL Environmental. It is registered in the State of North Carolina.

33. SCD is the owner and operator of the Sampson County Landfill and is the permitholder for its environmental permits.

34. Defendants Waste Industries, USA, LLC, and Waste Industries, LLC (together, "Waste Industries"), are subsidiaries of GFL Environmental, owners of SCD, and registered limited liability companies in the State of North Carolina.

35. Waste Industries has owned and operated the Landfill for over two decades. GFL Environmental acquired these companies in 2018, thereby gaining control of the Landfill.

36. Defendant Black Creek Renewable Energy, LLC ("Black Creek") is a wholly-owned subsidiary of GFL Environmental registered in the State of North Carolina.

37. Black Creek operated a landfill-gas-to-energy facility at the Landfill between 2011 and 2021.

38. GFL Environmental, Inc. is the owner of each of these entities; together, they comprise the past and present owners and operators of the Sampson County Landfill, including its municipal solid waste landfill units, construction and demolition landfill units, landfill leachate management system, and landfill gas management system.

39. These entities are collectively referred to herein as "GFL" or "Defendants."

40. Defendants are "persons[s]" within the meaning of the CWA, 33 U.S.C. §§ 1362(5) and 1365(a)(1).

41. Defendants are "person[s]" within the meaning of RCRA, 42 U.S.C. §§ 6903(15) and 6972(a)(1)(B).

9

## LEGAL BACKGROUND

**Resource Conservation and Recovery Act, 40 U.S.C. § 6901 *et seq.***

42. "RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC Western*, 516 U.S. 479, 483 (1996). RCRA's goal is to "promote the protection of health and the environment." 42 U.S.C. § 6902(a).

43. Section 7002(a)(1)(B) of RCRA authorizes citizen suits against "any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

44. Thus, citizens have a cause of action "against a defendant whose conduct—whether ongoing or purely in the past—'may' now pose an 'imminent and substantial endangerment to health or the environment.'" *Goldfarb v. Mayor and City Council of Baltimore*, 791 F.3d 500, 505 (4th Cir. 2015).

45. These claims "may be brought regardless of whether the plaintiff can demonstrate that the defendant's actions violated a specific RCRA-based permit[.]" *Id.*

46. RCRA imminent and substantial endangerment claims are "essentially a codification of the common law public nuisance" action but intended to be construed "more liberal[ly] than their common law counterparts." *United States v. Waste Indus., Inc.*, 734 F.2d 159, 167 (4th Cir. 1984) (quoting Subcomm. on Oversight and

Investigations of the H. Comm. on Interstate and Foreign Com., 96th Cong., Rep. on Hazardous Waste Disposal 31 (Comm. Print No. 96-IFC 1979)).

47.    In the citizen suit provision, Congress used "expansive language that confers upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1015 (11th Cir. 2004) (internal quotation marks omitted) (citing *United States v. Price*, 688 F.2d 204, 213-14 (3d Cir. 1982)).

48.    The term "person" means "an individual, trust, firm, joint stock company, corporation (including a government corporation), partnership, association, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 6903(15).

49.    The term "solid waste" means "any garbage, refuse, sludge . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities . . ." 42 U.S.C. § 6903(27).

50.    The term "disposal" means "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

51.    The term "solid waste management" means "the systematic administration of activities which provide for the collection, source separation, storage, transportation, transfer, processing, treatment, and disposal of solid waste." 42 U.S.C. § 6903(28).

52.    Federal courts are authorized to issue injunctive relief under the citizen suit provision of RCRA, 42 U.S.C. § 6972(a). Federal courts "have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, . . . to restrain any person who has contributed to or who is contributing to the past or present handling, storage, treatment, or disposal of any solid or hazardous waste referred to in [Section 7002(a)](1)(B), to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a)(2).

53.    Federal courts are authorized to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

54.    Section 7002(e) of RCRA, 42 U.S.C. § 6972(e), authorizes the Court to "award costs of litigation (including reasonable attorney and expert fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

**Clean Water Act, 33 U.S.C. § 1251 *et seq*.**

55.    The CWA's purpose is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish that objective, Congress set the national goal that "the discharge of pollutants into navigable waters be eliminated." *Id.* § 1251(a)(1).

56.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a National Pollutant Discharge Elimination System ("NPDES") permit issued by the EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

57.     The North Carolina Department of Environmental Quality was delegated the authority to issue NPDES permits in 1975. Stormwater NPDES permits are administered by the State's Division of Energy, Mineral, and Land Resources in its Office of Environmental Quality.

58.     Each violation of an NPDES permit, and each discharge of a pollutant that is not authorized by a permit, is a violation of the CWA. 33 U.S.C. §§ 1311(a), 1365(f); 40 C.F.R. § 122.41(a) (2024).

59.     The CWA defines "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12)(A).

60.     The CWA also prohibits the discharge of pollutants from a point source to navigable surface waters through hydrologically connected groundwater, where the discharge is the functional equivalent of a direct discharge to navigable waters. *See Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 183-84 (2020).

61.     The CWA defines "pollutant" to include "solid waste . . . sewage, garbage . . . chemical wastes, biological materials . . . wrecked or discarded equipment . . . and industrial, municipal, and agricultural waste." 33 U.S.C. § 1362(6).

62.     PFAS are pollutants under the CWA. *See id.* (defining pollutants to include chemical and industrial wastes); *see also Parris v. 3M Co.*, 595 F. Supp. 3d 1288, 1318–23 (N.D. Ga. 2022) (considering PFAS a pollutant under the CWA while addressing legal arguments where the presence of a pollutant is a threshold question); *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1279-1302 (N.D. Ga. 2021) (same).

63.     The CWA defines "point source" to include "any discernible, confined and discrete conveyance" from which pollutants may be discharged, "including but not limited to

any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, or containers . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

64. A source need not be the original source of pollution to be considered a point source; it only needs to convey the pollution. *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 104-05 (2004).

65. Landfill leachate collection systems that discharge into surface waters are point sources. 40 C.F.R. § 122.2.

66. The CWA defines "navigable waters" as "waters of the United States." 33 U.S.C. § 1362(7).

67. Surface waters are "waters of the United States" if they are, among other things, "currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce," or are "relatively permanent, standing or continuously flowing" tributaries of such waters. Wetlands are waters of the United States if they have a continuous surface connection to such surface waters. 40 C.F.R. § 120.2(a), (c) (current); 40 C.F.R. § 232.2 (2014); EPA & U.S. Army Corps of Eng'rs, *Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in* Rapanos v. United States & Carabell v. United States 6–7 (Dec. 2, 2008), https://perma.cc/TAA3-YP2G.

68. Under Section 505(a)(1) of the CWA, any citizen may commence a civil action in federal court on their own behalf against any "person" who is alleged to be in violation of an "effluent standard or limitation" under the Act. 33 U.S.C. § 1365(a)(1).

69. The CWA defines "person" to include "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

70. An "effluent standard or limitation" includes an unpermitted discharge, 33 U.S.C. § 1365(f)(1), and a violation of an NPDES permit, 33 U.S.C. § 1365(f)(7).

71. The unpermitted discharge of any pollutant is an unlawful act under Section 301(a) of the CWA, 33 U.S.C. § 1311(a), as is noncompliance with an NPDES permit, *id.*; 40 C.F.R. § 122.41(a) (2024).

72. Among other provisions of the CWA, citizen suits can be used to enforce the provisions of, and seek remedies for, (1) an unpermitted discharge in violation of Section 301 of the CWA, 33 U.S.C. § 1311 and (2) a violation of a condition of a permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342, which includes NPDES permits. 33 U.S.C. § 1365(a), (f).

73. Federal courts are authorized to issue injunctive relief under the citizen suit provision of the CWA. *See* 33 U.S.C. § 1365(a).

74. Federal courts are authorized to issue declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

75. Federal courts may assess civil penalties against violators of up to $66,712 per day for each violation of the CWA that occurs after November 2, 2015, where penalties are assessed after December 27, 2023. 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4 (2024).

76. In CWA suits, a court may award costs of litigation to the prevailing party, including attorney and expert witness fees. 33 U.S.C. § 1365(d).

## FACTUAL BACKGROUND

**The Sampson County Landfill's Operations**

77. GFL owns and operates the Sampson County Landfill in Roseboro, North Carolina.

78. The Landfill has been operating in Sampson County since its opening in 1973. The Landfill began with fewer than 20 acres in 1973 and over time expanded to its current footprint of nearly 1,000 acres.

79. GFL's operation of the Landfill involves the handling, storage, transportation, and/or disposal of solid waste.

80. The site contains multiple landfill units. GFL owns and operates two sites that are actively accepting waste: a Subtitle D Municipal Solid Waste landfill ("MSW"), in operation since 2000, and a Construction & Demolition landfill ("C&D"), in operation since 1996. GFL also operates two landfill units that stopped accepting waste in 2001: a closed MSW landfill and one closed C&D landfill.

81. These locations are depicted in Figure 1.

## Figure 1

## Sampson County Landfill



Case 7:24-cv-00831-BO   Document 1   Filed 08/30/24   Page 17 of 53

82.  MSW landfills accept non-hazardous waste, including household waste, sludge, and industrial solid waste. C&D landfills receive debris produced by construction and demolition of roads, buildings, and other sites.

83.  The Landfill accepts a variety of solid waste products, including commercial and municipal refuse, ashes, sludges from industrial facilities and wastewater treatment plants, animal manure, residue from incineration, food processing wastes, dredging wastes, tires, asbestos, and creosote/treated timbers.

84.  "Lined" landfills have a barrier between the soil beneath the waste piles and the waste itself, which is meant to separate contamination from the waste and leachate from the soil and groundwater below the landfill unit. "Unlined" landfills do not have this interstitial barrier. But while the presence of a liner is an improvement over an unlined landfill, liners may still fail at containing pollution due to tearing or disintegration over time. On average, lined MSW landfills leak 1.9% of their leachate into groundwater per year, with unlined landfills posing an even greater threat. Thabet Tolaymat et al., *A Critical Review of Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS) Landfill Disposal in the United States*, 905 Sci. Total Env't, Dec. 2023, at 11, https://perma.cc/SAG9-K7ES ("Tolaymat et al., 2023").

85.  The active landfill's MSW unit and the closed landfill's MSW unit are each lined. The C&D units at the active and closed landfill units are each unlined.

86.  The management of solid waste at the Landfill involves management of leachate, which is the wastewater created when precipitation comes in contact with landfill waste, and landfill gas ("LFG") produced during the decomposition process.

87.     GFL has used various leachate management techniques at the Landfill. GFL's
        leachate management system—a collection system with dozens of sumps which
        collect and move leachate caught by the Landfill's liners to secondary containment
        areas—previously relied in part on an LFG-fired leachate evaporator. After the
        evaporator stopped operating in 2022, GFL began trucking leachate off-site to a
        wastewater treatment plant.

88.     GFL captures a portion of LFG emissions through its landfill gas management
        system. The Landfill's first gas management system was primarily made up of flares,
        which it still uses. Between 2011 and 2021, Black Creek operated an LFG-to-energy
        facility on GFL's property, where it processed LFG, some of which was sent for off-
        site use, and some of which was combusted to power the leachate evaporator.

89.     GFL's operation of the Landfill also includes a Gravity Groundwater Intercept
        ("GGI") system that artificially lowers the groundwater beneath waste cells by
        capturing groundwater under the Landfill in underground pipes and carrying it to
        outfalls that discharge directly into Bearskin Swamp.

**Bearskin Swamp**

90.     The Landfill is located near a riverine system that includes a navigable stream and
        adjacent wetlands (referred to collectively as "Bearskin Swamp").

91.     The stream at the center of Bearskin Swamp is a Class C stream with Swamp Waters
        designation. This means it must be kept safe for fishing, boating, and swimming,
        among other uses, and it has a lower velocity than adjacent streams with steeper
        topography.

92.     Bearskin Swamp flows through the Eastern side of the Landfill and drains to the Southwest into the Little Coharie River, which in turn flows into the Great Coharie River.

93.     Bearskin Swamp is a significant marsh and wetlands ecosystem comprised of a permanently flooded Riverine System that includes Palustrine nontidal wetlands and deepwater habitat.

94.     Bearskin Swamp provides habitat for various aquatic species, including mussels, darters, and shiners, as well as myriad reptiles, amphibians, birds, and mammals.

95.     Because it is home to species such as sunfish, bluegill, perch, crappie, croakers, and eels, Bearskin Swamp is popular with recreational and subsistence fishers.

96.     Bearskin Swamp is part of the Cape Fear River Basin, North Carolina's largest and most biologically diverse river basin.

97.     The Landfill's edge is just a few hundred feet from Bearskin Swamp, and waste is stored in an upland area with steep topography leading down to Bearskin Swamp.

98.     Groundwater and surface water on the site generally flow from east to west, towards Bearskin Swamp.

99.     Upstream of the Landfill, PFAS compounds are non-detectable or present at relatively low concentrations. Adjacent to and downstream of the Landfill, however, they are dangerously high.

100.    GFL unlawfully discharges PFAS into Bearskin Swamp from the Landfill, its leachate collection system, outfalls for its GGI system, and numerous drainage channels, ditches, conveyances, and stormwater outfalls.

101. Local residents, including members of EJCAN, are concerned about the safety of eating fish caught in Bearskin Swamp or allowing their children to play in or near the water.

**The Snow Hill Community and Surrounding Neighborhoods**

102. Snow Hill is an unincorporated, rural community in Roseboro, North Carolina.

103. There are approximately 500 households within two miles of the Landfill's borders, with some residents living just a few hundred feet from its edge.

104. Prior to the Landfill's establishment, Snow Hill was a thriving community with communal life tied to the land. Those who grew up there remember community-wide barbecues, playing outdoor sports, foraging for fruits and berries, and fishing or hunting in and around Bearskin Swamp.

105. The Landfill's pollution has made these activities unpleasant, dangerous, and/or infeasible.

106. People in the Snow Hill community and broader Roseboro area still live, work, worship, play, and recreate in the area surrounding the Landfill—there are many homes, a church, neighborhoods, local businesses, and popular fishing and hunting spots nearby—but the quality and safety of these activities have been diminished and changed by the Landfill's pollution.

107. Many residents of Snow Hill rely on residential drinking water wells for their everyday water needs.

**PFAS**

*PFAS are persistent, mobile, and toxic.*

108.    PFAS encompass a group of thousands of chemicals that have been developed, manufactured, sold, and widely used by industry since the 1940s.

109.    These synthetic chemicals do not occur naturally in the environment. Longer-chain PFAS compounds, like perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS") were introduced first, but mounting evidence of the harms these substances can cause prompted industry to develop and shift to thousands of "novel" PFAS compounds. Many novel PFAS have shorter carbon backbones, or "chains," and are thus referred to as "short-chain" PFAS. Peer-reviewed studies of short-chain PFAS have revealed that, like their longer-chain predecessors, these PFAS are also harmful and can accumulate in the environment and our bodies. *See, e.g.*, Wendee Nicole, *Breaking It Down: Estimating Short-Chain PFAS Half-Lives in a Human Population*, 128 Env't Health Persps. 114002-1 (Nov. 2020), https://perma.cc/49BQ-W5DS. PFAS are highly mobile and can spread quickly through air, water, and other media.

110.    Because the type of carbon-fluorine bonds present in PFAS is one of the strongest ever created, PFAS are highly persistent when released into soil, water, or air. Once they have been released into the environment, PFAS persist indefinitely, earning them the moniker of "forever chemicals."

111.    While some PFAS compounds can break down or transform into other PFAS compounds, they remain harmful. Once inside our bodies, they stay there indefinitely, and they bioaccumulate in the tissue of animals and fish we eat.

112.    PFAS are not easily removed from water using traditional filters and cannot be removed by boiling.

113.    PFAS can also travel through the air and settle through deposition and precipitation, contaminating soil, crops, groundwater, and drinking water supplies.

114.    PFAS can even remain suspended in the air downwind of an emitting facility.

115.    Landfills can be a significant source of PFAS pollution in their surrounding environments. Scientists estimate that only 84% of PFAS remains contained in municipal solid waste landfills' waste mass, with 5% being emitted into the air via landfill gas and 11% migrating annually via leachate. Tolaymat et al., 2023. And a recent study of migration pathways indicates that landfill leachate may be an even greater contributor to PFAS leaving landfills than previously realized. Ashley M. Lin et al., *Landfill Gas: A Major Pathway for Neutral Per- and Polyfluoroalkyl Substance (PFAS) Release*, 11 Env't Sci. Tech. Letters 730-37 (2024), https://perma.cc/23PS-Y3RN.

*PFAS pollution harms people and the environment.*

116.    PFAS pose a significant threat to both human and environmental health, even at extremely low concentrations.

117.    There is virtually no safe level of PFAS in drinking water for humans. According to EPA, "there is no dose below which either [PFOA or PFOS, two of the most studied] chemical(s) is considered safe." PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638, 18639 (Mar. 29, 2023).

118.    People may be exposed to PFAS through drinking water, household uses like bathing

and showering, eating contaminated food, inhalation, and consuming animal products

like fish, livestock, or game that have accumulated PFAS in their tissues.

119.    People who rely on subsistence fishing—like many in the Snow Hill community—are

especially at risk because PFAS accumulate in fish tissue. Even low levels of seafood

consumption from PFAS-contaminated waters can lead to elevated PFAS levels in

humans.

120.    Recognizing the substantial danger PFAS pose to the public health, welfare, or the

environment, EPA has recently taken steps to limit human and environmental

exposure, including: finalizing drinking water standards ("MCLs") for six PFAS

compounds and increasing monitoring efforts under the Safe Drinking Water Act, 42

U.S.C. § 300f *et seq*.; designating two PFAS species as hazardous substances under

the Comprehensive Environmental Response, Compensation, and Liability Act, 42

U.S.C. § 9601 *et seq.*; adding seven PFAS to the Toxics Release Inventory under the

Emergency Planning and Community Right-to-Know Act, 42 U.S.C. § 11001 *et seq.*;

requiring additional reporting and evaluation under the Toxic Substances Control Act,

15 U.S.C. § 2601 *et seq.*; and putting forth additional rules and guidance regarding

the proper management of PFAS-containing waste under RCRA, 42 U.S.C. § 6901 *et

seq.. See, e.g.*, PFAS National Primary Drinking Water Regulation, 89 Fed. Reg.

32532, 32743-57 (Apr. 26, 2024) (to be codified at 40 C.F.R. pts. 141, 142) (Safe

Drinking Water Act); Designation of Perfluorooctanoic Acid (PFOA) and

Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed.

Reg. 39124 (May 8, 2024) (to be codified at 40 C.F.R. pt. 302) (Comprehensive

Environmental Response, Compensation, and Liability Act); Implementing Statutory

Addition of Certain Per- and Polyfluoroalkyl Substances (PFAS) to the Toxics

Release Inventory Beginning With Reporting Year 2023, 88 Fed. Reg. 41035 (June

23, 2023) (to be codified at 40 C.F.R. pt. 372) (Emergency Planning and Community

Right-to-Know Act); Toxic Substances Control Act Reporting and Recordkeeping

Requirements for Perfluoroalkyl and Polyfluoroalkyl Substances, 88 Fed. Reg. 70516

(Oct. 11, 2023) (Toxic Substances Control Act); Listing of Specific PFAS as

Hazardous Constituents, 89 Fed. Reg. 8606 (proposed Feb. 8, 2024) (to be codified at

40 C.F.R. pts. 261, 271 (RCRA).

121.    When considering only health risks, EPA has determined that there is no safe level of

PFOA or PFOS in drinking water. EPA's Maximum Contaminant Level Goals

("MCLGs"), which reflect the level of a contaminant in drinking water below which

no known or anticipated adverse health effects will occur, are therefore set at zero for

both PFOA and PFOS. PFAS National Primary Drinking Water Regulation, 89 Fed.

Reg. 32532, 32567 (Apr. 26, 2024) (to be codified at 40 C.F.R. pts. 141 and 142).

122.    PFOA and PFOS are carcinogenic to humans. They also cause developmental harms

or delays in fetuses and infants, kidney and testicular cancer, liver malfunction,

hypothyroidism, high cholesterol, lower birth weight and size in infants, obesity,

decreased immune response to vaccines, reduced hormone levels, and delayed

puberty.

123.    Other types of PFAS including perfluorononanoic acid ("PFNA"),

perfluorobutanesulfonic acid ("PFBS"), perfluorohexanesulfonic acid ("PFHxS"),

perfluorobutanoic acid ("PFBA"), perfluorohexanoic acid ("PFHxA"),

perfluoroundecanoic acid ("PFUnA"), perfluorododecanoic acid ("PFDoDA" or "PFDoA"), perfluoropropanoic acid ("PFPrA" or "PPF Acid"), perfluoropentanoic acid ("PFPeA"), and hexafluoropropylene oxide dimer acid and its ammonium salt ("GenX chemicals"), can endanger health at extremely low concentrations.

124.    Exposure to PFHxA likely causes liver, developmental, and immune system complications, and decreased red blood cell counts.

125.    Exposure to PFPrA, an ultra-short-chain PFAS, may cause liver injury.

126.    PFPeA readily crosses the placenta and has been found in higher levels in pregnant women with diabetes mellitus; it is also associated with altered thyroid hormone levels and decreased sperm mobility.

127.    Nafion Byproduct 2 has been linked to toxic intestinal and liver effects, developmental impacts, and reduced birth weight.

128.    Exposure to GenX chemicals may cause cardiovascular toxicity, maternal and fetal liver toxicity, and other fetal gene expression changes that can result in increased heart rate and spinal deformations.

129.    Exposure to mixtures of multiple PFAS can compound health risks, potentially disrupting maternal and neonatal thyroid function and reducing fertility in women.

130.    Although the impacts of inhaling PFAS are still understudied, at least one study has documented changes to immune cells in the lungs following respiratory exposure to GenX chemicals. Regular inhalation of PFAS in the air or airborne soil or dust may pose a threat to human health. Although ingestion is the most well-understood pathway of harmful PFAS exposure, exposure to these chemicals via dermal absorption while boating or swimming may also pose a risk. *See, e.g.*, Oddný

Ragnarsdóttir et al., *Dermal Bioavailability of Perfluoroalkyl Substances Using In Vitro 3D Human Skin Equivalent Models*, Env't Int'l, June 2024, at 7, https://perma.cc/GR4B-JXGZ.

131.    In addition to the risk they pose to human health, PFAS have also been shown to endanger the environment, causing harm to mammals, birds, fish, reptiles, amphibians, mollusks, and other aquatic invertebrates.

132.    The highly toxic nature of PFAS means that their presence in the environment poses an imminent and substantial endangerment to health or the environment.

*GFL accepted PFAS-contaminated waste from Chemours and other sources to the Landfill for decades.*

133.    GFL generates revenue by contracting to accept waste from across North Carolina. It competes with other waste management companies for industrial "customers" that pay to send their waste to landfills. Disposal of this industrial waste is a major source of revenue for GFL. *See* GFL Env't, Inc., *Annual Information Form for the Year Ended December 31, 2023* (2024), https://perma.cc/ASP9-VQSX.

134.    GFL has imported waste to the Landfill from various industrial facilities, including Alpek Polyester (formerly DAK Americas) and the Fayetteville Works Site owned by PFAS manufacturer DuPont and its spin-off company, Chemours.

135.    Beginning in 1995 and continuing until at least 2018, the Landfill accepted sludge containing PFAS from the Fayetteville Works facility owned by Chemours (formerly DuPont).

136.    During this time, the Landfill took in as much as 35,000 pounds (17.5 tons) of this PFAS-laden sludge *per week* from the Fayetteville Works facility. The Fayetteville

Works facility produced PFAS compounds proprietary to DuPont and Chemours, including GenX chemicals and Nafion Byproducts 1, 2, 4, 5, and 6.

*On-site sampling conducted by DEQ shows high concentrations of PFAS in landfill leachate and groundwater.*

137. DEQ tested for the presence of 25 PFAS compounds in the Landfill's leachate in 2019. *See generally* North Carolina Collective Study, <u>Collective Study of PFAS and 1,4-Dioxane in Landfill Leachate and Estimated Influence on Wastewater Treatment Plant Facility Influent</u>, Hart & Hickman (Mar. 10, 2020), https://perma.cc/JH85-S7YH. Despite the limited number of PFAS compounds being tested for, DEQ found extremely high total PFAS concentrations, 124,633.07 ppt, in the Landfill's leachate. The most prevalent PFAS compounds detected were GenX chemicals (10,800 ppt), PFOA (1,790 ppt), PFBS (7,530 ppt), PFBA (4,770 ppt), PFHpA (5,520 ppt), PFHxA (6,730 ppt), and PFPeA (86,400 ppt). Exhibit 3, tbl. 1.

138. More recent sampling by DEQ for 60 types of PFAS in 2023 revealed even higher numbers. The total PFAS level was 727,368.94 ppt (708,275.96 ppt field duplicate) in the closed unit's leachate and 1,422,796.6 ppt (1,022,332.8 ppt field duplicate) in the open unit's leachate. In total, 45 PFAS compounds were present in the leachate sampled from one or both of the Landfill's units, again with extremely high values for some individual PFAS, including some in the hundreds of thousands of parts per trillion, such as Nafion Byproduct 4 (852,000 ppt, field duplicate of 551,000 ppt, in the active unit); PFPeA (469,000 ppt, field duplicate of 551,000 ppt, in the closed unit); and NVHOS (219,000 ppt, field duplicate of 212,000 ppt, in the active unit). Exhibit 3, tbl. 2.

139. For a decade, while the Landfill's leachate evaporator was operating, it evaporated millions of gallons of this highly-concentrated, PFAS-laden leachate into the atmosphere.

140. Leachate is kept in both the MSW and C&D landfill units, just feet above the groundwater table. The C&D landfill units are unlined and thus do not have a liner to separate the solid waste from groundwater.

141. In late 2023, DEQ conducted sampling that showed that the shallow groundwater under both the open and closed cells of the Landfill contains high concentrations of the same PFAS compounds present in the Landfill's leachate. MW-107A, a groundwater monitoring well located to the East (downgradient) of the active MSW landfill, near Bearskin Swamp, measured a total PFAS concentration of 63,437.33 ppt. MW-15, located on the Southeast side of the closed MSW landfill directly adjacent to the formerly-operational leachate evaporator stack, had a total PFAS concentration of 29,771.03 ppt. MW-2N, located South and East of the active MSW landfill, has a total PFAS concentration of 18,354.42 ppt. MW-108, which GFL has determined is "representative" of PFAS in its downgradient wells for the active landfill unit, measured 5,852.075 ppt (with a field duplicate of 6,308.387 ppt), while the "representative" upgradient sample measured just 0.574 ppt. GFL, *Response to Comments and Revised Work Plan for PFAS Sampling and Analysis – Permit No. 82-02* at 4 (June 29, 2023), https://perma.cc/W4P7-GCDG; Exhibit 3, tbl. 3. Each of these four wells were contaminated by numerous PFAS compounds, every single one of which has also been identified in the Landfill's leachate.

*Sampling of Bearskin Swamp shows elevated levels of PFAS near the Landfill.*

142.    In 2019, University of North Carolina researchers ("UNC researchers") sampled along Bearskin Swamp and found extensive PFAS contamination that they determined was attributable to the Landfill. The UNC researchers found significantly higher concentrations of PFAS adjacent to and downstream from the Landfill, relative to upstream sampling locations.

143.    In a 2023 peer-reviewed article reviewing this data, the UNC researchers concluded that these sampling results "indicat[ed] offsite migration of PFAS." Aleah Walsh & Courtney G. Woods, *Presence of Perfluoroalkyl Substances in Landfill Adjacent Surface Waters in North Carolina*, Int'l J. Env't Rsch. & Pub. Health, Aug. 4, 2023, at 1, https://perma.cc/D7RW-A64U ("UNC Researchers, 2023").

144.    The UNC researchers also warned that these results warranted additional monitoring and testing, noting that "elevated levels of novel PFAS at sites proximal to the landfill in Sampson County provide compelling evidence to support the recommendation for monitoring of PFAS chemicals at the landfill . . . and reporting to state and federal officials. Furthermore, households in this area that rely on private wells may need to be tested. Furthermore, monitoring events in surface and groundwater should occur with more regularity . . . [and] the allowable distance between residences and landfills should also be reconsidered." *Id.* at 12-13.

145.    Subsequent sampling of Bearskin Swamp by DEQ has likewise revealed that the same PFAS compounds present in Landfill leachate appear at levels orders of magnitude higher adjacent to and downstream of the Landfill than upstream.

146.    DEQ sampled SW-1, an upstream location in Bearskin Swamp, SW-4, a sampling point located in a tributary of Bearskin Swamp downstream of the Landfill, and SW-

5, a sampling point located in a drainage channel on Landfill property that discharges into Bearskin Swamp.

147. A sampling event by DEQ on September 13, 2023, found 32 different PFAS compounds present at sampling points SW-4 or SW-5 at higher levels than upstream point SW-1. DEQ found 27.347 ppt at SW-1, 3,754.19 ppt at SW-4, and 7,927.86 ppt at SW-5 (with a field duplicate of 8,232.95 ppt) *See* Exhibit 3, tbl. 4.

148. In a DEQ sampling event conducted on November 14, 2023, 26 PFAS compounds were present in higher levels at a sample obtained at downstream surface water points than the upstream surface water point.[1] Every single one of these PFAS compounds were also present in Landfill leachate. The total PFAS level upstream was 21.587 ppt, but increased to 411.364 ppt (428.504 field duplicate) ppt at DEQ's downstream location near the Roseboro Highway bridge. *See* Exhibit 3, tbl. 5.

*Sampling of Residential Drinking Water Wells*

149. In late 2023 and early 2024, DEQ began testing residential drinking water wells in the Snow Hill community for PFAS compounds, including many present in the Landfill's leachate. DEQ tested well water at 30 homes within 2,000 feet of the Landfill. DEQ's sampling revealed detectable levels of PFAS in 22 of the residential drinking water wells tested, and PFOA and/or PFOS above MCLGs in 14 homes. *See* Exhibit 3, tbl. 6.

150. EPA's Maximum Contaminant Level Goals ("MCLGs") are set at zero to reflect the fact that any level of PFAS in drinking water poses a danger to human health. PFAS

---

[1] The upstream sampling location was located where Bearskin Swamp flows past Bonnetsville Road (35,01352, -78.44878), and the downstream sampling location was located just south of the Landfill, where Bearskin Swamp flows under the Roseboro Highway (34.96392, -78.44384).

National Primary Drinking Water Regulation, 89 Fed. Reg. 32532, 32567 (Apr. 26, 2024).

151. DEQ sampling revealed that 12 residential drinking water wells within 2,000 feet of the Landfill had levels of PFOS that exceeded the MCLG for PFOS, and 13 had levels of PFOA that exceeded the MCLG for PFOA. *See* Exhibit 3, tbl. 6.

152. Exposure to several of the PFAS compounds detected by DEQ in these residential wells—such as PFOS, PFOA, PFHxS, PFBS, PFBA, PFHxA, PFNA, PFDA, GenX chemicals, PFPrA, and PFPeA—has been linked to adverse health effects in humans.

153. Every single one of these and other PFAS compounds found in the residential drinking water well samples were also detected in high concentrations in the Landfill's leachate and in groundwater beneath the Landfill's liner.

154. EJCAN has several members whose homes have residential well water with PFAS concentrations that exceed the MCLGs, as confirmed by DEQ sampling, making the water unsafe to drink. These members rely on their well water for all or part of their household needs.

*The Landfill polluted air, surface water, groundwater, and soil with PFAS.*

Leachate Management System: Evaporator

155. Leachate is the liquid produced when precipitation and other liquids mix with solid waste.

156. GFL operates a leachate management system, consisting of a leachate collection system, which collects and moves leachate caught by the Landfill's liners to secondary containment areas. The leachate management system captures and recirculates leachate throughout the Landfill.

157. Between 2012 and 2022, as part of this system, the Landfill operated a landfill gas-fired leachate evaporator.

158. The evaporator used combusted landfill gas as a fuel source, heating the Landfill's liquid leachate and evaporating it into the air.

159. Through this process, GFL evaporated up to 34,000 gallons per day of landfill leachate, thereby releasing leachate constituents, including PFAS, into the air.

160. In 2021, the last full year that the leachate evaporator operated, GFL processed over six million gallons of leachate and emitted various other pollutants present in landfill leachate, including ammonia and arsenic, into the air.

161. In 2022, GFL requested a rescission of the Landfill leachate management facility's air permit. GFL stopped operating its leachate evaporator in July 2022.

162. After closing the evaporator, GFL began sending its landfill leachate to wastewater treatment plants for offsite treatment. GFL has applied for an NPDES permit to treat the leachate onsite using reverse osmosis; this permit would authorize GFL to construct an on-site leachate treatment facility and discharge treated leachate into the Little Coharie River. That NPDES permit application is pending with DEQ. In this leachate treatment permit application, GFL acknowledged that "[t]he fate of PFAS during evaporation, one of the current disposal methods for the landfill, is not currently well-understood; it is not clear how environmentally sound continued evaporation is as a treatment method for leachate." GFL, *Sampson County Disposal NPDES Permit Application* 50 (May 21, 2021), https://perma.cc/QC6T-KPNH.

163.   Researchers have found that landfills relying on "evaporation likely contribute[]

significant quantities of PFAS to the atmosphere and surrounding environment."

Tolaymat et al., 2023.

164.   GFL's operation of the leachate management facility, and specifically the leachate

evaporator, have deposited PFAS into the surrounding air, water, and soil.

Landfill Gas Management System: Flares

165.   During the decomposition of organic matter, landfills produce significant air

emissions. GFL operates a landfill gas management system, which captures some of

these emissions.

166.   The Landfill's first landfill gas management system consisted primarily of flares (i.e.,

flames that partially combust landfill gases), in operation since at least 2006.

167.   Landfill flares are designed to destroy nonmethane organic compounds, not PFAS.

GFL's landfill flares are operated at too low a temperature to destroy PFAS in landfill

gas; consequently, "PFAS may be released into the atmosphere via fugitive gas

emissions or gas flares." Tolaymat et al., 2023; *see also* Ashley M. Lin et al., *Landfill

Gas: A Major Pathway for Neutral Per- and Polyfluoroalkyl Substance (PFAS)

Release*, 11 Env't Sci. & Tech. Letters 730, 730 (2024), https://perma.cc/23PS-Y3RN

(concluding that "landfill gas . . . serves as a major pathway for the mobility of PFAS

from landfills").

168.   PFAS in ambient air can be deposited onto soil via precipitation, which may

contribute to contamination of private drinking water wells and surface water.

169.    GFL's ongoing operation of the landfill gas management system, and specifically the flaring of landfill gas containing PFAS, have sent PFAS into the surrounding air, water, and soil.

Landfill Gas Management System: Landfill-Gas-to-Energy

170.    Between 2011 and 2021, Black Creek operated a landfill-gas-to-energy system ("LFGTE") on GFL's property.

171.    After capturing the landfill gas, Black Creek collected, cooled, and dewatered it. Black Creek ultimately sent the landfill gas to the LFGTE facility to be combusted in the engines and turned into electricity.

172.    As with flaring, Black Creek's combustion of landfill gas for use in an LFGTE system did not destroy PFAS, because the combustion process operated at too low a temperature to destroy them.

173.    Black Creek's combustion of landfill gas created huge quantities of toxic emissions. During operation, the Black Creek LFGTE facility was the state's fifth-highest non-landfill emitter of the carcinogen vinyl chloride, and in 2019 alone it emitted over 48 tons of formaldehyde and 259 tons of carbon monoxide. *See, e.g.*, GFL, *Air Emission Inventory – Reporting Year 2019*, at 12 (June 30, 2020), https://perma.cc/Y5AJ-EAH3.

174.    Although neither the company nor the state monitored PFAS emissions during the facility's operation, it is likely that, like the dozens of other air pollutants it emitted, Black Creek emitted large quantities of PFAS during combustion until the facility's closure in March 2021.

175.    GFL's operation of the LFGTE system, and specifically the combustion of landfill gas containing PFAS, sent PFAS into the surrounding air, water, and soil.

176.    Although the LFGTE facility is now closed, the Landfill continues to use the landfill gas management system's flares to manage landfill gas, continuing to release PFAS into the environment.

*The Landfill is discharging PFAS into Bearskin Swamp from multiple point sources.*

Discharges Into SW-4

177.    High PFAS levels at SW-4, a sampling point located in a tributary of Bearskin Swamp that flows through the Landfill's property, demonstrate that the Landfill is discharging PFAS into waters of the United States.

178.    SW-4 is "located downstream and north of the MSW disposal area" in a "tributary to Bearskin Swamp." GFL, *First Semi-Annual 2023 Water Quality Monitoring Report* 7 (Sept. 2023), https://perma.cc/6JKB-NE6D.

179.    The presence of PFAS at SW-4 in a concentration of 3,754.19 ppt indicates that this tributary is likely carrying PFAS into Bearskin Swamp. All 31 distinct compounds identified at SW-4 were either lower or not detected at SW-1, the upstream site. Exhibit 3, tbl. 4.

SW-5 Drainage Channel

180.    A drainage channel runs across the Landfill's property, into Bearskin Swamp. The surface water sampling point "SW-5" is located in this drainage channel.

181.    SW-5 is "east of the active facility" and GFL admits that this site is located "in a drainage channel that discharges into a wetland area." *Id.*

182. Upstream of SW-5, total PFAS levels are low or non-detectable, measuring just 27.347 ppt during the September 2023 sampling event. Exhibit 3, tbl. 4.

183. But just a short distance downstream, SW-5 had a much higher total PFAS level, measuring 7,927.86 ppt (8,232.95 field duplicate) during the same sampling event. Exhibit 3, tbl. 4.

184. GFL discharges the PFAS in this channel into Bearskin Swamp without an NPDES permit.

185. The UNC researchers' data show that these discharges have been ongoing since at least October 2019, when samples were taken at "ML," a site close to SW-5. For each PFAS compound that was tested—PFBA, PFPeA, PFBS, PFHxA, PFHpA, PFOA, GenX, PMPA, PEPA, NVHOS, Nafion Byproduct 2, and Nafion Byproduct 4—the concentrations at ML exceeded concentrations at the upstream site, with most compounds showing statistically significant increases above the levels detected upstream. UNC Researchers, 2023.

186. All of these unpermitted discharges constitute ongoing violations of the CWA.

Gravity Groundwater Intercept System

187. The Landfill's GGI system, in operation since 2005, collects PFAS-contaminated wastewater and discharges it into Bearskin Swamp.

188. The GGI system consists of a series of trenches that intercept groundwater underneath the Landfill cells, collecting and draining it into a sump underneath each cell. The sumps each connect to discharge lines, which gravity drain the groundwater to Bearskin Swamp via the GGI Outfall 1 and GGI Outfall 2 (together, "GGI Outfalls").

In other words, the GGI system captures groundwater under the Landfill's cells and discharges it into Bearskin Swamp.

189.    The groundwater captured by the GGI system is, as discussed above, highly contaminated with PFAS.

190.    To date, 38 different PFAS compounds have been identified in at least one onsite monitoring well. As discussed above, several wells have total PFAS concentrations in the tens of thousands of parts per trillion: MW-107A has a total PFAS concentration of 63,437.33 ppt; MW-15 has 29,771.03 ppt; MW-2N totals 18,354.42 ppt; and MW-108's measures 5,852 ppt, with a field duplicate of 6,308.387. Exhibit 3, tbl. 3.

191.    These pollutants do not remain underneath the Landfill because the GGI system captures and conveys the contaminated water out and discharges it into Bearskin Swamp.

192.    The GGI system has at least two outfalls, GGI Outfall 1 and GGI Outfall 2. DEQ sampling revealed that the GGI Outfalls are discharging massive quantities of PFAS directly into Bearskin Swamp. Sampling at GGI Outfall 1 found 9,590.99 ppt of PFAS (9,504.31 ppt field duplicate) and GGI Outfall 2 measures 3,884.822 ppt of PFAS.

193.    These discharges from the GGI Outfalls are contaminating Bearskin Swamp. During DEQ's September 2023 sampling of Bearskin Swamp, 31 PFAS were measured at higher levels at sampling points SW-4 and SW-5 close to the GGI Outfalls than at upstream location SW-1. The PFAS compounds that were elevated at one or both of these downstream locations were also among the PFAS present in GGI Outfall 1, Outfall 2, or both. Exhibit 3, tbls. 4, 7.

194. Similarly, during DEQ's November 2023 sampling event, 26 PFAS were present in higher levels at a point downstream of the GGI Outfalls than upstream from them. All 26 of these PFAS were found in one or both GGI Outfall samples.

195. The GGI Outfalls are point sources of PFAS discharges not covered by an NPDES permit. These unpermitted PFAS discharges are therefore unlawful.

196. GGI Outfall 1 is located east of the active MSW landfill in Bearskin Swamp, between the Landfill and surface water location SW-5.

197. 31 types of PFAS compounds have been found in GGI Outfall 1. Total PFAS concentration at GGI Outfall 1 is extremely high—9,590.99 ppt (with a field duplicate of 9,504.31 ppt). The closest surface water monitoring point, SW-5, is directly to the southeast of GGI Outfall 1. SW-5 has similarly high total PFAS levels, measuring 7,927.86 ppt (with a field duplicate of 8,232.95 ppt). Exhibit 3, tbl. 7.

198. All 28 PFAS compounds identified in SW-5 were also present in GGI Outfall 1, indicating GGI Outfall 1 is the source of the contamination in the SW-5 drainage channel. *Id.* Via this drainage channel and potentially other routes, GGI Outfall 1 discharges PFAS into Bearskin Swamp.

199. GGI Outfall 2 is located north of the active MSW in Bearskin Swamp, and is positioned between the Landfill and sampling location SW-4. 28 distinct PFAS compounds have been found in GGI Outfall 2, and the total PFAS concentration at this location is also very high, measuring 3,884.822 ppt.

200. The closest surface water monitoring point, SW-4, which is just northeast of GGI Outfall 2 in a tributary of Bearskin Swamp, contained 3,754.193 ppt of total PFAS.

The 22 PFAS present in SW-4 were, with a sole exception, are also present in samples from GGI Outfall 2. *See* Exhibit 3, tbls. 4, 7; Figure 2.

Figure **2**



<u>Other Discharges from the Landfill into Bearskin Swamp</u>

201.    PFAS in landfill leachate are polluting groundwater beneath the Landfill. The PFAS are conveyed through groundwater into Bearskin Swamp, in the functional equivalent of a direct discharge.

202.    The Landfill's leachate collection system is discharging leachate directly into Bearskin Swamp, conveying PFAS overland into surface water. These conveyances include toe drains, as well as several additional ditches, channels, and other conveyances that carry PFAS-contaminated wastewater and discharge PFAS into Bearskin Swamp.

*The Landfill is discharging contaminated stormwater into Bearskin Swamp.*

203.    The Landfill's certificate of coverage under the State Stormwater General Permit for Landfills, NCG120054 ("Stormwater General Permit") allows the Landfill to "discharge stormwater" but expressly omits discharges of contaminated stormwater— that is, stormwater that has come into "direct contact with landfill wastes, the waste handling and treatment areas, or landfill wastewater." Div. of Energy, Mineral, and Land Res., *General Permit No. NCG120000*, N.C. Dep't of Env't Quality (July 1, 2021), https://perma.cc/U2W8-393M.

204.    The Notice of Intent, which permittees, including GFL, must sign and submit to qualify for coverage under the Stormwater General Permit, instructs landfill operators that "stormwater discharges from . . . discharge of waste (including leachate) to the waters of the state **are specifically excluded from coverage under this General Permit**." Div. of Energy, Min., & Land Res., *National Pollutant Discharge*

*Elimination System NCG120000 Notice of Intent* 1, N.C. Dep't of Env't Quality, https://perma.cc/62TR-B2QM (emphasis in original).

205.    The Stormwater General Permit prohibits any discharges other than those authorized by the permit—i.e., anything other than non-contaminated stormwater.  This permit does not, therefore, authorize any PFAS discharge.

206.    The Landfill's stormwater runoff system includes several stormwater outfalls ("together, Stormwater Outfalls") that discharge directly into Bearskin Swamp and its tributaries. Stormwater Outfalls 3, 4, 5, and 6 discharge to the east of the Landfill into Bearskin Swamp, and GFL has listed "Bearskin Creek" (the stream at the center of Bearskin Swamp) as the receiving waters for Stormwater Outfalls 1, 2, and 10. *See, e.g.*, GFL, *2019 Second Semi-Annual Discharge Monitoring Report* (Dec. 30, 2019), https://perma.cc/QWK6-SAGB.

207.    Under the Stormwater General Permit, the Landfill must monitor these outfalls for chemical oxygen demand, total suspended solids, and fecal coliform.

208.    GFL's sampling reveals high levels of fecal coliform—a measure of pathogens common in landfill waste—at the outfalls. Recent sampling showed 3,800 coliform fecal units ("cfu") per 100 mL at Stormwater Outfall 2, and 5,600 cfu per 100 mL at Stormwater Outfall 10. GFL, *November 2022 Exceedance Reporting and Tier Notification* (Dec. 21, 2022), https://perma.cc/QXJ2-KBSH. These results indicate that GFL is discharging contaminated stormwater—i.e., stormwater that has come into direct contact with landfill wastes, waste handling and treatment areas, or landfill wastewater—in violation of the Stormwater General Permit.

209. Just as stormwater is becoming contaminated with fecal coliform from landfill waste and carrying this contamination into Bearskin Swamp via the Stormwater Outfalls, it is also picking up and carrying PFAS pollution into Bearskin Swamp.

210. In-stream water sampling conducted by GFL and DEQ near Stormwater Outfalls 1, 2, 3, 4, 5, 6, and 10 reveals elevated PFAS concentrations. For example, the highly contaminated sampling point SW-5 is just a few hundred meters southeast (and downstream) of Stormwater Outfall 3. Similarly, there are four stormwater outfalls—including Stormwater Outfall 6, which, like Stormwater Outfall 3, discharges into Bearskin Swamp—within a few hundred meters of SW-4, which also has PFAS levels in the thousands of parts per trillion. *See* Figure 1, *supra* page 16. These results further indicate that GFL is discharging PFAS-contaminated stormwater into Bearskin Swamp in violation of the Stormwater General Permit.

## CLAIMS FOR RELIEF

**Count I:    Imminent and Substantial Endangerment under the Resource Conservation and Recovery Act (40 U.S.C. § 6972(a)(1)(B))**

211. Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

212. Section 7002(a)(1)(B) of RCRA authorizes citizens to bring suit "against any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, transport, or disposal of any solid or hazardous waste which may present an imminent

43

and substantial endangerment to health or the environment." 42 U.S.C. §
6972(a)(1)(B).

213.    Defendants are "person(s)" within the meaning of this citizen suit provision.

214.    Defendants are past and present owners and operators of the Sampson County
Landfill. GFL Environmental Inc., Sampson County Disposal, LLC, Waste Industries,
LLC, Waste Industries USA, LLC, and Black Creek Renewable Energy, LLC, are
each responsible for the Landfill's RCRA violations.

215.    Waste treated, stored, and/or disposed of at the Sampson County Landfill is "solid
waste" under 42 U.S.C. § 6903(27). GFL handles, stores, transports, and disposes of
solid waste containing PFAS at the Landfill. This includes sludge from the Chemours
Fayetteville Works Facility, dewatered sludge from municipal wastewater treatment
plants, and other solid waste streams with high concentrations of PFAS.

216.     GFL has operated, and continues to operate, several landfill gas flares, which
combust PFAS-laden landfill gas and emit PFAS into the air. PFAS continuously
emitted through landfill flares contaminate the air, deposit in surface water and soil
around the Snow Hill community, and leach into residential drinking water wells.

217.    Due to the high PFAS load in the solid waste handled and stored by GFL, the
Landfill's leachate—the liquid that forms when precipitation and other liquids filter
through wastes placed in a landfill—has extremely high PFAS concentrations. Recent
leachate sampling conducted by GFL and DEQ found over 700,000 ppt in the closed
landfill unit's leachate, and more than 1,000,000 ppt in the active landfill unit's
leachate.

218.    GFL previously operated a leachate evaporator that evaporated approximately 34,000 gallons per day of this PFAS-laden landfill leachate into the air. PFAS emitted in this manner have contaminated the air, deposited in surface water and soil of the Snow Hill community, and leached into residential drinking water wells.

219.    PFAS-contaminated leachate is also escaping the Landfill's leachate collection system and contaminating groundwater beneath the Landfill. Recent groundwater sampling conducted by GFL and DEQ found concentrations at monitoring wells as high as 63,437.33 ppt in the shallow groundwater beneath the Landfill.

220.    The Landfill's GGI system captures some of this PFAS-contaminated groundwater and conveys it directly into Bearskin Swamp through GGI Outfalls 1 and 2. Recent sampling conducted by GFL and DEQ at GGI Outfall 1 and GGI Outfall 2 found PFAS concentrations of 9,590.99 ppt (9,504.31 ppt field duplicate) and 3,884.822, respectively. Recent sampling conducted by DEQ at in-stream surface water locations near GGI Outfall 1 and GGI Outfall 2 found PFAS concentrations as high as 7,927.86 (8,232.95 ppt field duplicate) and 3,754.193, respectively.

221.    GFL's operation of the GGI system has discharged extensive quantities of PFAS into Bearskin Swamp. Even low concentrations of PFAS are toxic and harmful to aquatic ecosystems and the species that live there. Therefore, GFL's operation of the GGI system may imminently and substantially endanger the environment of Bearskin Swamp and the Little Coharie River, into which Bearskin Swamp flows.

222.    Members of the Snow Hill community enjoy fishing or recreating in Bearskin Swamp. Direct contact with PFAS-contaminated water may have harmful effects on human health. In streams with high PFAS concentrations, PFAS is known to

bioaccumulate in fish tissue. Consuming fish with high levels of PFAS in their tissue is unsafe and has been linked to negative health effects in humans. Therefore, GFL's operation of the GGI system may imminently and substantially endanger the health and well-being of people who recreate or fish in Bearskin Swamp or the Little Coharie River.

223.    Members of the Snow Hill community raise livestock and hunt on their property and in public areas near Bearskin Swamp. PFAS in the environment also bio-accumulates in terrestrial organisms, including livestock and game, such as deer. It is unsafe for people to consume terrestrial animals with high levels of PFAS in their tissue. Therefore, GFL's operation of the GGI system may imminently and substantially endanger the health and wellbeing of Snow Hill community members who consume livestock or hunted animals.

224.    Groundwater contaminated by PFAS from the Landfill's leachate also travels underground and contaminates residential drinking water wells. The PFAS compounds DEQ detected in 22 of these wells were the same compounds found in the Landfill's leachate and in the contaminated shallow groundwater below the Landfill's liner.

225.    There is no safe level of PFAS in drinking water. Any detectable level of PFAS in drinking water is associated with significant health risks.

226.    PFAS cannot be removed from water using traditional filters. Short-chain and ultra-short-chain PFAS, including PFBS, PFBA, PFPeA, PFHxS, PFHpA, PFPrA, and PFHxA, which are present in Landfill leachate, groundwater, and residential drinking water wells, are particularly challenging to remove from water.

46

227. Many Snow Hill residents rely on residential wells for their household water needs, including drinking water, cooking, cleaning dishes, showering, gardening, and caring for pets and livestock.

228. The imminent and substantial endangerment to health and the environment posed by GFL's PFAS pollution of surface water, groundwater, residential drinking water wells, air, and soil is continuing and ongoing as of the date of this Complaint.

229. GFL's ongoing PFAS pollution harms EJCAN and its members. EJCAN does not have any plain, speedy, or adequate remedy at law for this harm.

230. Section 7002(a) of RCRA empowers the Court to compel GFL to "take such . . . action as may be necessary" to eliminate the endangerment. 42 U.S.C. § 6972(a).

231. Section 7002(e) of RCRA authorizes the Court to award costs of litigation (including reasonable attorney and expert fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate. 42 U.S.C. § 6972(e).

232. EJCAN requests that the Court issue an enforcement order and an injunction order to GFL to cease and remediate the ongoing imminent and substantial endangerment described herein. 42 U.S.C. § 6972(a).

**Count II:     Discharges of Pollutants to Waters of the United States Without an NPDES Permit in Violation of the Clean Water Act (33 U.S.C. § 1311)**

233. Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

234. The CWA prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of an NPDES permit. 33 U.S.C. § 1311.

235. Defendants are "person[s]" within the meaning of the CWA.

236. Bearskin Swamp is a water of the United States within the meaning of the CWA because it is a navigable in fact waterway. The wetlands adjacent to Bearskin Swamp have a continuous surface connection with Bearskin Swamp. Therefore, these wetlands are waters of the United States.

237. In the alternative, Bearskin Swamp is a continuously flowing tributary of Little Coharie River, which is a navigable in fact waterway.

238. PFAS are pollutants as defined by the CWA, 33 U.S.C. § 1362(6).

239. The Landfill's leachate—the liquid that forms when rainwater and other liquids filter through wastes placed in a landfill—has extremely high PFAS concentrations. Recent sampling conducted by GFL and DEQ found over 700,000 ppt in the closed landfill unit's leachate, and more than one million ppt in the active landfill unit's leachate.

240. PFAS-contaminated leachate is escaping the Landfill's leachate collection system and contaminating groundwater beneath the Landfill. Recent groundwater sampling conducted by GFL and DEQ found tens of thousands of parts per trillion of PFAS in the shallow groundwater beneath the Landfill.

241. As discussed in Count I, the Landfill's GGI system captures this highly PFAS-contaminated water and discharges it directly into Bearskin Swamp through GGI Outfall 1 and 2. These discharges are not authorized by any NPDES permit.

242. GGI Outfalls 1 and 2 are discernible, confined, and discrete conveyances from which PFAS are being discharged from the Landfill to Bearskin Swamp. Therefore, each of these conveyances is a "point source" under the CWA. 33 U.S.C. § 1362(14).

243. GFL's leachate management system is a "point source" under the CWA. 33 U.S.C. § 1362(14). Discharges from the leachate management system are not covered by any NPDES permit.

244. GFL is also discharging PFAS to Bearskin Swamp through ditches and other conveyances that travel overland. For example, overland drainage channel SW-5 contains PFAS concentrations of 7,927.86 ppt (8,232.95 ppt field duplicate). SW-5 is a discernible, confined, discrete conveyance that discharges this highly-PFAS contaminated discharge directly into Bearskin Swamp.

245. SW-5 is a "point source" under the CWA. 33 U.S.C. § 1362(14). These discharges have no NPDES permit.

246. GFL's discharge of PFAS to Bearskin Swamp from the Landfill cells and leachate collection system through hydrologically connected groundwater constitutes the "functional equivalent" of a direct discharge to surface waters requiring an NPDES permit. GFL does not have an NPDES permit for such a discharge.

247. The Landfill's only NPDES permit, its Stormwater General Permit, does not authorize any discharge of PFAS.

248. GFL's discharges of PFAS into Bearskin Swamp and its tributaries through GGI Outfalls 1 and 2, Stormwater Outfalls 1, 2, 3, 4, 5, 6, and 10, drainage channels SW-5, and the leachate management system have occurred, and continue to occur without authorization under a NPDES permit. Each of these discharges is a separate and distinct violation of the CWA. 33 U.S.C. §§ 1311, 1319(d); 40 C.F.R. § 122.41 (2024).

249.   GFL's unpermitted PFAS discharges were first documented, and commenced no later than October 2019, when surface water sampling revealed GFL's unpermitted surface water discharges of PFAS to Bearskin Swamp.

250.   On October 12, 2019, November 10, 2019, December 20, 2019, and January 25, 2020, in-stream sampling from Bearskin Swamp at sampling locations ML and RB, which are adjacent and downstream of GGI Outfall 1, GGI Outfall 2, SW-4, and SW-5, showed that GFL has been discharging PFAS compounds into Bearskin Swamp, including GenX chemicals, PMPA, PEPA, NVHOS, Nafion Byproducts 2 and 4, PFBA, PFPeA, PFBS, PFHxA, PFHpA, and PFOA. UNC Researchers, 2023.

251.   On September 13, 2023 (SW-4 and SW-5 sample date) and September 14, 2023 (GGI sample date) sampling from GGI Outfall 1, GGI Outfall 2, SW-4, and SW-5 revealed numerous PFAS discharges to Bearskin Swamp and its tributaries by GFL. For example, this sampling documented significant PFAS discharges from SW-5, GGI Outfall 1, and GGI Outfall 2 into Bearskin Swamp. These unpermitted PFAS discharges are ongoing. *See* Exhibit 3, tbls. 4, 7.

252.   On November 14, 2023, in-stream surface water sampling revealed PFAS discharges to Bearskin Swamp by GFL. *Id.* at tbl. 5.

253.   Since GFL's PFAS discharges into Bearskin Swamp and its tributaries were first documented on October 12, 2019, GFL has continued to violate the CWA every day.

254.   Defendants GFL Environmental Inc., Sampson County Disposal, LLC, Waste Industries, LLC, and Waste Industries USA, LLC are each liable for these CWA violations.

**Count III:**      **Violation of NPDES Stormwater Permit (33 U.S.C. § 1311)**

255.   Plaintiff repeats, re-alleges and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

256.   The Stormwater General Permit permits discharges of non-contaminated stormwater to Bearskin Swamp, but forbids all other discharges, including of PFAS-contaminated stormwater.

257.   GFL's sampling reveals consistently high levels of fecal coliform at Stormwater Outfalls 2 and 10. These results indicate that GFL is discharging contaminated stormwater—i.e., stormwater that has come into direct contact with landfill wastes, waste handling and treatment areas, or landfill wastewater—in violation of the Stormwater General Permit.

258.   In-stream water sampling conducted by GFL directly downstream from Stormwater Outfalls 1, 2, 3, 4, 5, 6, and 10 reveals elevated PFAS concentrations.

259.   These results indicate that GFL is discharging PFAS-contaminated stormwater into Bearskin Swamp in violation of the Stormwater General Permit.

260.   GFL's ongoing discharges of PFAS through these stormwater outfalls violate the CWA, because, as the Stormwater General Permit and the CWA regulations explain, "any permit noncompliance constitutes a violation of the Clean Water Act." Div. of Energy, Mineral, and Land Res., *General Permit No. NCG120000*, N.C. Dep't of Env't Quality (July 1, 2021), https://perma.cc/U2W8-393M; 40 C.F.R. § 122.41(a).

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

261. Declare that GFL's management of PFAS-containing solid waste may present an imminent and substantial endangerment to health or the environment in violation of RCRA;

262. Declare that GFL's discharges of PFAS into Bearskin Swamp from point sources, including from SW-5, the GGI Outfalls, and the leachate collection system, violate the CWA's prohibition on unpermitted discharges;

263. Declare that GFL's discharges of PFAS-contaminated stormwater violate its Stormwater General Permit, thereby violating the CWA;

264. Enjoin GFL from further violating RCRA and the CWA by ordering it to abate ongoing PFAS pollution, timely remediate all existing pollution, comply with all conditions in the Stormwater General Permit, including the prohibition on contaminated stormwater discharges and all other discharges and, to the extent GFL continues to discharge from its GGI Outfalls, apply for an NPDES permit;

265. Order GFL to assess and remediate the harm caused by GFL's violations of RCRA and the CWA, including by providing members of the Snow Hill community safe alternative water supply for home use at no cost to address the danger of drinking contaminated water; alternative food supply to replace livestock, game, fish, and garden staples made unsafe to consume by pollution; and safe places to gather and recreate free of pollution;

266. Award Plaintiff the fees and costs of litigation, including reasonable attorney's fees, costs, and expert fees and expenses;

267. Impose civil penalties for GFL's ongoing violations of the CWA, as described in Count II, of an amount not to exceed $66,712 per day per violation for all violations of the CWA;

268. Retain jurisdiction over this action until GFL has come into consistent and permanent compliance with the CWA and RCRA and complied with every order of this Court including any consent decree entered by this Court; and

269. Grant other such relief as the Court deems just and proper.

This 30th day of August, 2024.

Respectfully submitted,

/s/ Maia Hutt
Maia Hutt
(919) 391-7537
mhutt@selcnc.org
State Bar No. 53764

/s/ Irena Como
Irena Como
(919) 867-4404
icomo@selcnc.org
State Bar No. 51812

/s/ Zoe Gabrielson
Zoe Gabrielson
(919) 867-1817
zgabrielson@selcnc.org
State Bar No. 60883

Southern Environmental Law Center
601 W. Rosemary St., Ste. 220
Chapel Hill, NC 27516
Phone: (919) 967-1450
Fax:   (919) 929-9421
Attorneys for Plaintiff