# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### SOUTHERN DIVISION

|  |  |
|---|---|
| ENVIRONMENTAL JUSTICE COMMUNITY ACTION NETWORK,<br><br>     Plaintiff,<br><br>v.<br><br>GFL ENVIRONMENTAL, INC.; SAMPSON COUNTY DISPOSAL, LLC; WASTE INDUSTRIES, USA, LLC; WASTE INDUSTRIES, LLC; BLACK CREEK RENEWABLE ENERGY, LLC,<br><br>     Defendants. | Civil Action No. 7:24-CV-831 |

## CONSENT DECREE

This Consent Decree is entered by and between Environmental Justice Community Action Network ("EJCAN", or "Plaintiff") and Sampson County Disposal, LLC and its parent and affiliated companies, Waste Industries, USA, LLC; Waste Industries, LLC; Black Creek Renewable Energy, LLC, and GFL Environmental, Inc. (together "GFL", or "Defendants"). Plaintiff and Defendants, as parties to this Consent Decree, are collectively referred to herein as the "Parties" or individually as a "Party." Capitalized terms used and not otherwise defined in the body of this Consent Decree shall have the meaning set forth in Article III.

1

# I.   RECITALS

WHEREAS, Plaintiff EJCAN is a North Carolina non-profit member organization based in Sampson County, North Carolina, dedicated to achieving environmental justice and providing technical, legal, educational, and funding resources to Sampson County communities facing environmental problems; and EJCAN has members who live, work, or regularly visit family and friends in the unincorporated community of Snow Hill, located in Roseboro, North Carolina;

WHEREAS, Defendant GFL owns and operates the Landfill, which includes municipal solid waste and construction and demolition waste units, and is sited in the Snow Hill Community;

WHEREAS, PFAS chemicals are used in a large number of consumer products and industrial applications, including cookware, food packaging, stain repellant fabrics and carpeting, and fire-fighting foam, among others, which materials are typically disposed of in permitted solid waste landfills;

WHEREAS, GFL contends that the Chemours Company's Fayetteville facility was a customer of the Landfill that did not disclose that its waste contained significant amounts of PFAS, specifically Gen-X chemicals, until such information became public in 2018, at which point the Landfill voluntarily ceased accepting such waste;

2

WHEREAS, GFL contends that beginning in 2019 and continuing to the present, GFL has worked with DEQ to address potential environmental impacts associated with the Landfill's receipt of the PFAS-containing waste, including the Chemours waste, and has also undertaken additional measures to address those potential impacts;

WHEREAS, on April 10, 2024, the EPA, based on its review of the best available health effects data and its determination that PFAS exposure may result in adverse health effects and illness, issued a final rule establishing maximum contaminant levels, or MCLs, for certain PFAS compounds in public drinking water systems, including individual numeric MCLs for five PFAS: PFOA, PFOS, PFHxS, PFNA, and HFPO-DA (GenX);

WHEREAS, on February 13, 2024, EJCAN sent GFL and other requisite persons and entities a Notice of Intent to Sue for Violations of the Resource Conservation and Recovery Act ("RCRA NOI"). EJCAN alleged that GFL's past and present handling, storage, treatment, or disposal of PFAS-laden solid waste—including operation of landfill flares that combust PFAS-laden landfill gas; a leachate evaporator that superheated PFAS-laden landfill leachate and released its constituents into the air; and various surface water and groundwater discharges—had contaminated the air and water, including Bearskin Swamp—a popular recreation and fishing area—and several private drinking water wells in the Snow

3

Hill community, with PFAS, and thus poses an imminent and substantial endangerment to the health of people living in and around the Snow Hill community and the environment in violation of RCRA;

WHEREAS, on May 7, 2024, EJCAN sent GFL and other requisite persons and entities a Notice of Intent to Sue for Violations of the Clean Water Act ("CWA NOI"). EJCAN alleged that GFL had and continued to discharge PFAS through the Sampson County Landfill's Groundwater Gravity Intercept system, leachate collection system, drainage channels, and other conveyances, into Bearskin Swamp, a water of the United States, without a National Pollutant Discharge Elimination System Permit in violation of the CWA; and that GFL's past and ongoing discharge of PFAS through its stormwater outfalls into Bearskin Swamp violated its Certificate of Coverage under North Carolina NPDES General Stormwater Permit for Landfills, NCG120054, and the CWA;

WHEREAS, on August 30, 2024, EJCAN filed a Complaint against GFL in the United States District Court for the Eastern District of North Carolina, alleging, *inter alia*, that GFL's treatment, storage, and disposal of PFAS-laden solid waste contaminated surface water, groundwater, and residential drinking water wells in the Snow Hill community and that these waste management practices may present an imminent and substantial endangerment to human health and the environment in violation of Section 7002 of RCRA, 42 U.S.C. § 6972(a)(1)(B); that GFL's discharge

4

of PFAS from GGI Outfall 1, GGI Outfall 2, SW-4, SW-5, and through other conveyances and groundwater transport into Bearskin Swamp violated Section 301 of the CWA, 33 U.S.C. § 1311(a), which prohibits discharges of pollutants to waters of the United States without a NPDES permit; and that GFL's discharge of PFAS into Bearskin Swamp through Stormwater Outfalls 1, 2, 3, 4, 5, 6, and 10 violated GFL's Certificate of Coverage under North Carolina's stormwater general permit for landfills, and therefore violated the Clean Water Act, 33 U.S.C. § 1311(a);

WHEREAS, GFL (a) denies all allegations and alleged violations made in both the RCRA NOI and CWA NOI, and the Complaint, and admits no liability, fault, or wrongdoing of any kind arising out of Plaintiff's allegations herein or in the Litigation, and (b) believes that the alleged environmental matters at issue should be addressed in a cooperative manner with the NC DEQ and other stakeholders rather than through the litigation process;

WHEREAS, the United States "encourages citizen suit parties, in reaching proposed consent judgments, to consider environmental justice considerations and any disproportionate impacts on communities that may be involved in the alleged violations."[1];

---

[1] U.S. Dep't of Justice, *Notification on Receipt of a Clean Air Act or Clean Water Act Citizen Suit Complaint* 4 (last updated Jan. 2022), https://perma.cc/C6L2-FST6.

WHEREAS, a copy of this proposed Consent Decree was received by the Attorney General of the United States and the EPA Administrator more than forty-five (45) days before entry of the proposed Consent Decree by the Court as required by 33 U.S.C. § 1365(c)(3); and

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid prolonged litigation between the Parties; this Consent Decree is fair, reasonable, and in the public interest; and the relief proposed is within the scope of the Litigation, furthers the objectives of the CWA and RCRA, and does not violate either statute.

**NOW THEREFORE, WITHOUT THE TRIAL OR ADJUDICATION OF ANY ISSUE OF FACT OR LAW AND WITHOUT ADMISSION BY DEFENDANTS OF ANY VIOLATIONS OR WRONGDOING, AND UPON CONSENT AND AGREEMENT OF THE PARTIES, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

## II.    JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over the Litigation pursuant to Section 505(a) of the CWA, 33 U.S.C. § 1365(a), Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), and 28 U.S.C. § 1331.

6

2. For purposes of entry of this Consent Decree and any action to enforce this Consent Decree, GFL consents to this Court's jurisdiction.

3. Venue is proper in the United States District Court for the Eastern District of North Carolina pursuant to 33 U.S.C. § 1365(c)(1), 42 U.S.C. § 6972(a)(2), and 28 U.S.C. § 1391(b).

## III. DEFINITIONS

Whenever the terms listed below are used in this Consent Decree or in any attached Appendix, the following definitions will apply:

4. "Bearskin Swamp" means the tributary of the Little Coharie Creek (also known as the "Little Coharie River") and part of the Cape Fear River Basin that flows along the Eastern border of the Landfill and through portions of the Snow Hill Community.

5. "Clean Water Act" or "CWA" means the federal law governing pollution control and water quality, codified at 33 U.S.C. § 1251 *et seq.*

6. "Community Landfill Website" means the public-facing website maintained and updated by GFL containing information regarding emissions data, emergency alerts, and community complaints and GFL's responses to those concerns as set forth herein.

7

7. "DEQ" means the North Carolina Department of Environmental Quality.

8. "Effective Date" means the date upon which the approval of this Consent Decree is recorded on the Court's docket.

9. "EPA" means the United States Environmental Protection Agency.

10. "EPA limit of quantitation" has the same meaning as "reporting limit" and "minimum level," and means the lowest detectable level at which the concentration of a pollutant in a medium can be quantified using EPA Method 537.1.

11. "GenX chemicals" means hexafluoropropylene oxide dimer acid ("HFPO-DA") and its ammonium salt. In the context of MCLs, "GenX" refers specifically to the concentration of HFPO-DA.

12. "GFL" means GFL Environmental Inc. and its indirect wholly-owned subsidiaries, Sampson County Disposal, LLC, Waste Industries USA, LLC, Black Creek Renewable Energy, LLC, and Waste Industries, LLC; provided, however, that the sole permit holder of the Landfill is Sampson County Disposal, LLC, and inclusion of additional GFL entities is not intended to be a statement on the appropriateness or lack

8

of appropriateness of their inclusion in the matters set forth herein or in the Litigation.

13. "Gravity Groundwater Intercept" or "GGI" system means the series of trenches that intercept and gravity drain groundwater underneath the liner system of the Landfill to sumps, which connect via a discharge line to outfalls that discharge into Bearskin Swamp.[2]

14. "GGI Outfall 1" is the southernmost outfall of the GGI system, located at approximately 34.981522, -78.450461.

15. "GGI Outfall 2" is the northernmost outfall of the GGI system, located at approximately 34.986443, -78.458161. Together, GGI Outfall 1 and GGI Outfall 2 are "the GGI Outfalls."

16. "Leachate" means a liquid that has passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste. *See* 40 CFR 258.2.

17. "Litigation" means the Complaint filed by Plaintiff on August 30, 2024.

18. "Maximum Contaminant Level" or "MCL" means the legal threshold limit of the concentration of a substance that is allowed in public

---

[2] *See, e.g.*, Letter from John R. Fearrington & Joan A. Smyth, Smith Gardner Inc., to Elizabeth Werner, Hydrogeologist, N.C. Dep't of Env't Quality (May 5, 2017), https://perma.cc/C4BD-D8MN.

drinking water systems under the Safe Drinking Water Act and the National Primary Drinking Water Regulations, as set by EPA. The current MCLs are 4.0 nanograms per liter or parts per trillion (ppt) for PFOA, 4.0 ppt for PFOS, 10 ppt for PFHxS, 10 ppt for PFNA, and 10 ppt for HPFO-DA ("GenX chemicals"). As used in this document, "MCLs" refers to the concentrations in this paragraph, and the levels shall remain applicable even if the underlying EPA action upon which they are based is rescinded, set aside, vacated, or otherwise becomes ineffective.

19. "National Pollutant Discharge Elimination System Permit" or "NPDES Permit" means a permit issued pursuant to the Clean Water Act authorizing discharges into waters of the United States.

20. "Operational Life" means the time period during which the Landfill is actively accepting solid waste for disposal at the Landfill. The Landfill's operational life will be over when it permanently ceases to accept all solid waste for disposal at the Landfill.

21. "PFAS" means per- and polyfluoroalkyl substances.

10

22. "PFAS Work Plan" means the documents, approved by DEQ, that outline GFL's procedures and plans to analyze soil, groundwater, GGI discharges, surface water, and leachate for PFAS.[3]

23. "PFOA" means Perfluorooctanoic acid or such other chemical definition recognized by EPA.

24. "PFOS" means Perfluorooctane sulfonic acid or such other chemical definition recognized by EPA.

25. "PFNA" means Perfluorononanoic acid or such other chemical definition recognized by EPA.

26. "PFHxS" means Perfluorohexanesulfonic acid or such other chemical definition recognized by EPA.

27. "Resource Conservation and Recovery Act" or "RCRA" means the federal law governing the management of solid and hazardous waste, codified at 42 U.S.C. § 6901 *et seq.*

28. "Sampson County Landfill" or "the Landfill" refers to all closed and active waste cells maintained by GFL under NC Solid Waste Permit

---

[3] See (1) GFL's June 28, 2023 *Response to Comments and Revised PFAS Work Plan for PFAS Sampling and Analysis – Permit No. 82-02* (approved by DEQ July 7, 2023), https://perma.cc/R78V-5XTX; (2) GFL's June 28, 2023 *Response to Comments and Revised PFAS Work Plan for PFAS Sampling and Analysis – Permit No. 82-01* (Approved by DEQ July 7, 2023) https://perma.cc/T7JL-QJ8D; (3) GFL's February 15, 2024 *Initial Site Assessment Work Plan* (approved by DEQ February 21, 2024), and (4) GFL's July 29, 2024 *Secondary Site Assessment Work Plan* (pending DEQ approval).

Numbers 82-01 and 82-02, and any new waste cells opened by GFL under NC Solid Waste Permit Number 82-02, or new permits, which are located at 7434 Roseboro Highway in Roseboro, North Carolina, and excludes the landfill cells maintained by Sampson County under Permit 82-01.

29. "Snow Hill Community" is a neighborhood located in rural Roseboro, North Carolina. For the purpose of this Consent Decree, the geographic boundaries of the Snow Hill Community are set forth in Exhibit 1.

30. "Special Order by Consent" or "SOC" means an order issued by DEQ to an entity that has accepted responsibility for causing or contributing to pollution of waters of the State which temporarily authorizes interim corrective measures aimed at achieving compliance with environmental laws. *See* N.C. Gen. Stat. § 143-215.2; N.C. Admin. Code 02H .1200 *et seq*.

31. "Special Waste" means solid wastes that can require special handling and management, including white goods, whole tires, used oil, lead-acid batteries, and medical wastes. *See* N.C. Gen. Stat. § 130A-290(a)(40).

12

# IV.    INJUNCTIVE RELIEF

## A.    Remedial Investigation & Pollution Prevention

32.    **Emissions Monitoring System and Odor Mitigation.** Within ninety (90) days of the Effective Date, the Parties shall jointly select, and GFL will, at its sole expense, retain an independent, third-party consultant ("Consultant") to design and implement a continuous emissions monitoring system around the perimeter of the Landfill. The development, implementation, and other costs related to the system shall be financed by GFL. Taking into account the recommendations of the Consultant, the placement of the system's monitoring stations shall be mutually agreed to by the Parties. Monitoring stations shall be located to isolate emissions originating primarily from the Landfill (as opposed to from nearby industrial hog operations). Taking into account the recommendations of the Consultant, the Parties shall determine reasonable emissions standards. All data collected from the continuous emissions monitoring system will be contemporaneously made public on the Community Landfill Website maintained by GFL.

33.    The initial monitoring period for the continuous emissions monitoring system shall last three-hundred-and-sixty-five (365) days.

13

34. Within sixty (60) days of the conclusion of the initial monitoring period, the Consultant shall issue a report identifying the sources of any actionable fugitive emissions and recommending emission and odor reduction measures.

35. Within ninety (90) days of the Consultant delivering this report to the Parties, GFL shall, to the maximum extent practicable, implement the recommended emission and odor reduction measures.

36. During the initial monitoring period, GFL shall respond to and meaningfully address odor complaints raised by community members and/or by EJCAN. GFL shall use one or more of the following odor reduction strategies to address these complaints: enhanced management of odorous waste streams (e.g. dead animals, food waste), odor management in construction areas, and enhanced daily and interim cover practices.

37. **Drone Surface Emissions Monitoring.** Within ninety (90) days of the Effective Date, GFL shall have submitted a request to EPA to change its required methane emissions monitoring technique from on-foot monitoring to EPA-approved drone surface emissions monitoring to identify fugitive methane emissions at the Landfill. Once approved, and subject to the EPA-approved vendor's availability, GFL shall

14

implement and continue this monitoring for the Operational Life of the Landfill. GFL shall share the results of this monitoring with EJCAN on a semi-annual basis and shall stop methane leaks or other sources of fugitive emissions identified through this monitoring in a timely manner.

**B.** **Treatment of PFAS Discharges & Treatment Standards**

38. **Interim GGI Treatment Standards and Permitting.** GFL shall continue to diligently pursue and make all best efforts to obtain a Special Order by Consent ("SOC") from DEQ permitting the temporary treatment of discharge from GGI Outfalls 1 and 2.

39. As part of this process, GFL shall request that DEQ impose enforceable removal standards and/or effluent limitations in the SOC that meet or exceed the following:

    a. Start-up through two (2) months: 50% removal standard for PFOA, PFOS, Gen-X, PFHxS, and PFNA (subject to EPA limits of quantitation for EPA Method 537.1 Modified).

    b. Three (3) months to one (1) year: 80% removal standard for PFOA, PFOS, Gen-X, PFHxS, and PFNA (subject to EPA limits of quantitation for EPA Method 537.1 Modified).

15

c. Greater than one (1) year: achieve EPA MCLs for PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA (subject to EPA limits of quantitation for EPA Method 537.1 Modified).

40. In the event that DEQ issues an SOC or otherwise permits an interim treatment system for discharges from the GGI Outfalls without these minimum removal standards or effluent limits, as applicable, GFL shall ensure that discharges from the GGI Outfalls meet the standards set forth herein.

41. In the event that DEQ refuses to issue an SOC or otherwise permit the interim GGI Outfall treatment system, GFL shall, within 90 days after any such refusal, apply for a NPDES permit for the GGI Outfalls. In any application, GFL shall request that DEQ include, at a minimum, enforceable effluent limits in the NPDES permit for PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA equal to EPA's MCLs for these compounds.

42. **Permanent GGI Treatment Standards and Permitting.** Unless GFL has moved forward under the conditions in paragraph 41, once GFL's discharges from the GGI Outfalls consistently satisfy the standards set forth in Paragraph 39(c), GFL shall apply for a NPDES permit applicable to the discharges at GGI Outfall 1 and Outfall 2. GFL shall

16

request that DEQ include, at a minimum, enforceable effluent limits in the NPDES permit for PFOA, PFOS, Gen-X, PFHxS, and PFNA equal to EPA's MCLs for these compounds.

43. **Leachate Treatment System Permitting.** GFL shall continue to diligently pursue and make its best efforts to obtain a NPDES permit from DEQ for the proposed discharge from its leachate treatment reverse osmosis system. Within sixty (60) days of the Effective Date, GFL shall request in writing that DEQ include enforceable effluent limitations in any NPDES permit issued for the leachate treatment reverse osmosis system equal to EPA's MCLs for the following constituents: PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA. GFL shall also include this request for enforceable effluent limitations equal to EPA's MCLs for PFOA, PFOS, HFPO-DA (Gen-X), PFHxS, and PFNA in any subsequent permit application (including amendments or renewals) for the leachate treatment reverse osmosis system. During this permitting process, GFL shall keep EJCAN apprised of communications with DEQ and agrees to take any input from EJCAN into consideration.

44. **Restriction on New Special Waste Contracts.** As of the Effective Date, GFL shall decline any and all new contracts for the acceptance at

17

the Landfill of the following: (1) soils and other materials associated with PFAS remediation projects generated from military bases, and (2) PFAS-containing fire-fighting foams or residue, until such a time that the permanent treatment system for the GGI Outfalls and leachate reverse osmosis treatment system are operational and in compliance with the standards set forth in Paragraphs 42 and 43.

## C. Community Engagement & Accountability

45. **Information Sharing.** As of the Effective Date, GFL shall take the following measures to increase transparency, engagement, and accountability regarding matters at the Landfill that impact the Snow Hill Community and EJCAN members:

46. Until such time as the reverse osmosis leachate treatment system and the permanent GGI treatment system are consistently meeting the discharge standards set forth in Paragraphs 42 and 43 for a period of four (4) years, GFL shall share with EJCAN, through counsel and concurrently with transmission, all materials and communications related to PFAS at the Landfill that GFL transmits to DEQ and/or that DEQ transmits to GFL. This includes but is not limited to documents related to the PFAS Work Plan, sampling results, and GGI and leachate treatment system permitting documents. GFL shall make reasonable

18

efforts to deliver these materials to EJCAN prior to submission to DEQ and shall, in good faith, take EJCAN and/or EJCAN's consultants' input into consideration prior to submitting documents to DEQ.

47. GFL shall make its Special Waste Consultant, who reviews sampling data from special waste streams and confirms the material meets the permit requirements for disposal at the Landfill along with any special handling required, available for discussion with EJCAN and/or its consultants upon request. GFL shall also share information regarding the review and approval process for special waste on the Community Landfill Website. Upon request of EJCAN, the Special Waste Consultant shall attend one community meeting in Snow Hill (described in Paragraph 52) and shall be available to answer questions from the community.

48. **Semi-Annual Compliance Report.** Semi-annually, and beginning one-hundred-and-eighty (180) days after the Effective Date, until such time as the reverse osmosis leachate treatment system and the permanent GGI treatment system are consistently meeting the discharge standards set forth in Paragraphs 42 and 43 for a period of four (4) years, GFL shall share with EJCAN, through counsel, a report detailing GFL's compliance with this Consent Decree, the actions GFL

19

has taken to carry out its obligations detailed herein, and any deficiencies or failures to comply. In the event of any deficiencies or failures to comply, the report will include an explanation and proposed plan to come into compliance with this Consent Decree.

49. **Truck Policy.** GFL shall, within thirty (30) days of the Effective Date, post its truck access policy in public view at the Landfill's scalehouse. The policy shall state that customer access to the Landfill is limited solely to the gate on Highway 24. GFL shall also request truck traffic (1) not to access the gate on Highway 24 through the Snow Hill Community, and (2) not to line up outside of the gate outside of the Landfill's operating hours.

50. **Emergency Management Plan and Emergency Alert System.** GFL shall use its best efforts to urge local emergency management personnel to develop a community evacuation plan in the event of an emergency at the Landfill. Subject to obtaining access to phone numbers, GFL shall institute a "robocall" system (calls and texts) for people who live within two (2) miles of the Landfill. This system will be used solely to alert community members in the event of an emergency at the Landfill that may impact public safety or prompt the need for evacuation.

51. **Community Engagement and Complaint Process.** GFL shall use its best efforts to provide meaningful engagement opportunities with residents of the Snow Hill Community and keep the community informed of activities at the Landfill, including but not limited to progress on the PFAS Work Plan, results of the emissions monitoring system (Paragraph 32), and odor management efforts. This commitment shall include, but is not limited to the following actions:

52. GFL shall attend quarterly, in-person community meetings in the Snow Hill Community coordinated with Snow Hill residents and/or EJCAN. The initial such meeting shall be held within sixty (60) days of the Effective Date and the first two such meetings will be treated as confidential and will only be open to the Parties and their counsel, Snow Hill Community residents, and EJCAN members.

53. Within ninety (90) days of the Effective Date, GFL shall establish and fund an unmanned hotline to receive complaints or concerns related to the Landfill.

54. Within one hundred twenty (120) days of the Effective Date, GFL shall establish and maintain a public website, the Community Landfill Website, that community members can access for the latest information on Landfill matters that impact the community; provided however, that

21

GFL may request an extension as long as it is working diligently and in good faith towards meeting the deadline and can demonstrate that the delay is outside of GFL's reasonable control, such as due to its third-party vendor's or consultant's availability. The Community Landfill Website shall include a tab or window for community members to submit complaints related to the Landfill.

55. GFL shall respond to Landfill-related complaints submitted through the hotline or the Community Landfill Website within seven (7) business days indicating, to the best of its ability, the source of the issue and steps GFL will take to address the complaint. GFL's responses to complaints and description of steps being taken to address each complaint shall be regularly posted on the Community Landfill Website.

56. No later than the date upon which the Community Landfill Website is active, GFL shall establish an internal complaint response and escalation process to ensure that community complaints are meaningfully addressed within seven (7) business days. This process will be shared with EJCAN and posted on the Community Landfill Website on the same tab or window used to submit complaints related to the Landfill.

22

**D.    Diversion of Waste**

57.    **School Recycling and Composting Program.** Within one hundred and twenty (120) days of the Effective Date, GFL shall establish a school recycling and composting program in at least ten (10) public schools in Sampson County and fund a recycling and composting-related curriculum in these schools through the end of the 2027-2028 school year. Thereafter, GFL will offer to continue the recycling program at a rate to be negotiated with the school system.

58.    **Recycling Campaign.** Within one hundred and twenty (120) days of the Effective Date, GFL shall fund and initiate a public campaign in Sampson County to encourage recycling.

**E.    Conservation**

59.    **Wetland Conservation.** Within one hundred and eighty (180) days of the Effective Date, GFL shall place the thirty (30) acres of wetlands currently owned by GFL at the Roseboro Mine site (Attached as Exhibit 2) into trust through a conservation easement.

23

**F. Community Benefits**

60. GFL shall provide benefits to the Snow Hill Community consistent with the terms of the confidential Community Benefit Settlement Agreement.

## V. RELEASE

61. For the consideration herein and other good and valuable consideration, EJCAN hereby waives, releases, discharges, and covenants not to sue GFL for any and all claims which were alleged or could have been alleged in the Litigation.

## VI. OTHER TERMS

62. **Effect of Consent Decree.** This Consent Decree resolves all claims which were alleged or could have been alleged against GFL by EJCAN in the Litigation, and all such claims shall be deemed to be dismissed with prejudice. This Consent Decree in no way affects or relieves GFL from its responsibility and obligation to comply with Federal, State and local laws or regulations and applicable permits.

63. **Administrative Review.** The Parties acknowledge, agree, and notify the Court that, pursuant to 33 U.S.C. § 1365(c)(3), this Consent Decree cannot be entered or effective prior to forty-five (45) days following the

24

receipt of this Consent Decree by the Attorney General and the EPA Administrator. Therefore, upon execution of this Consent Decree by the Parties, Plaintiff shall serve copies of the Consent Decree upon the U.S. Attorney General, EPA Administrator, and EPA Regional Administrator in accordance with 40 C.F.R. § 135.5. The Parties shall also jointly lodge the Consent Decree with the Court upon execution. Upon expiration of the 45-day review period, so long as the reviewing authorities do not object to the entry of this Consent Decree, the Parties shall jointly move the Court for entry of the Consent Decree and notify the Court regarding dates upon which the EPA Administrator and Attorney General received copies pursuant to 40 C.F.R. § 135.5(b).

64. **No Admission of Liability or Fault**. By entering into this Consent Decree, GFL denies and does not admit to liability, fault or wrongdoing.

65. **Continuing Jurisdiction.** The United States District Court for the Eastern District of North Carolina shall have continuing jurisdiction to interpret and enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder, and for such other and further actions as may be necessary or appropriate in the construction or execution of the Consent Decree.

25

66. **Effect of Entry or Lack of Entry.** Upon entry by the Court, this Consent Decree resolves all claims which were alleged against GFL by EJCAN in the Litigation and the Litigation shall be dismissed with prejudice. If for any reason the reviewing authorities object to this Consent Decree and/or the Court refuses to approve and/or enter this Consent Decree in the form presented, the Parties shall retain all rights they had in this litigation before lodging of this Consent Decree. In the event that the Court refuses to approve and/or enter this Consent Decree in the form presented, or in the event the United States proposes modifications to this Decree, the Parties shall negotiate in good faith in an attempt to resolve such objection and/or refusal by the Court; however, the Parties reserve and shall retain all rights to object to any modification proposed by the United States, or any other person or entity.

67. **Entire Agreement.** The Parties have reached an independent confidential Community Benefit Agreement related to these matters. This Consent Decree, along with the independent Community Benefit Settlement Agreement, constitutes the entire agreement among the Parties concerning the subject matter hereof and supersedes all previous

26

correspondence, communications, agreements and understandings, whether oral or written, among the Parties or their representatives.

68. **Modification.** This Consent Decree may be modified or amended only by an Order of Court, made upon a written joint request of the Parties.

69. **Authorization.** Each Party represents and warrants that the person signing this Consent Decree on behalf of such Party is duly authorized to enter into this Consent Decree on the Party's behalf.

70. **Successors and Assigns.** This Consent Decree shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

71. **Notices/Dispute Resolution.** The Parties shall provide one another with thirty (30) days written notice and opportunity to cure any alleged breach of this Consent Decree before commencing an action to enforce this Consent Decree. Such notice shall be given to all counsel of record, as reflected on the Court's docket report, and may be given via email. If the Parties cannot reach an agreed resolution within thirty (30) days after the receipt of notice by the other Party, then the Parties agree to commence mediation of the dispute in good faith no later than seventy-five (75) days after the receipt of the notice. A Party may petition the

27

District Court to (a) resolve the dispute; (b) designate a mediator for good cause shown if the Parties cannot agree on a mediator mutually agreeable to the Parties; or (c) seek to enforce the Consent Decree only where a mediation was conducted in good faith and is unsuccessful.

72. **Counterparts.** This Consent Decree may be signed in counterparts. Facsimile, electronic and scanned signatures or copies of this Consent Decree shall be effective as originals for all purposes.

ENTERED this ___5___ day of December, 2024.

The Honorable Terrence W. Boyle
Judge, United States District Court
Eastern District of North Carolina

28

# Exhibit 1

## Snow Hill Community Map

# Snow Hill Community Boundary



# Exhibit 2

## Wetland Conservation Map

Exhibit 2

Wetland Conservation Map

Full parcel:



Approx 30 acre portion to be put into conservation in purple below:

